IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MAURICE D. VAUGHN

OPINION AND ORDER

v.

14-cv-317-wmc
11-cr-90-wmc

UNITED STATES OF AMERICA

---

Maurice D. Vaughn ("Vaughn") has filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct the conviction and sentence that he received in *United States v. Vaughn*, Case No. 11-cr-90-wmc. Vaughn was convicted of conspiracy to distribute more than 100 grams of heroin in that case and sentenced to 240 months' imprisonment. Vaughn contends that he is entitled to relief because he was denied effective assistance of counsel at his trial and sentencing proceeding. The government has filed a response and Vaughn has submitted a reply. After considering all of the parties' submissions, and based on this court's clear recollection of the relevant proceedings, Vaughn's motion is denied for reasons set forth below.

BACKGROUND[1]

I.      **Offense Conduct**

Vaughn's involvement with drug trafficking offenses began at a young age. At 17 years old, he was involved in a drug transaction that resulted in the shooting death of a customer in Kalamazoo, Michigan. Vaughn was convicted and sentenced to prison as an

---

[1] The facts underlying the offense are outlined in the Presentence Report prepared by the probation office and in the Seventh Circuit's published decision, affirming Vaughn's conviction and sentence. *See United States v. Vaughn*, 722 F.3d 918, 921-25 (7th Cir. 2013). To the extent that it is relevant to Vaughn's ineffective-assistance claims, the factual and procedural background is summarized here.

accessory after the fact in connection with that offense.  After serving his sentence and parole for that crime, Vaughn was convicted of cocaine possession in Knox County, Illinois.  Soon after, Vaughn was charged in the Western District of Wisconsin with possession with intent to distribute crack cocaine, stemming from drug trafficking activities in Beloit.  *See United States v. Vaughn*, 98-cr-81-bbc.  In that case, Vaughn was convicted and sentenced to 135 months' imprisonment, later reduced on the government's motion to 108 months, followed by a five-year term of supervised release that terminated in 2008.

Back on the street in 2007, police began investigating Vaughn for his role in the distribution of heroin in the Beloit area.  In June 2007, a confidential informant attempted to purchase two grams of heroin from Vaughn.  As part of the controlled buy, the informant wore a wire, got into Vaughn's car and gave Vaughn $250 for a prearranged purchase. Before Vaughn tendered the drugs, however, he checked the informant for a wire.  Discovering the wire, Vaughn ripped it off the informant and then kicked the informant out of his car. Vaughn then drove away, tossing the money from the informant out of his car window.

During this same time period, Vaughn distributed heroin to an individual named Jesse Green. Green told investigators that from January to September 2007, he bought approximately three to five grams of heroin from Vaughn daily.

Another individual named Patrick Riley told police that he began using heroin purchased from Vaughn beginning in late 2007 or early 2008. Riley told investigators that from 2008 through mid-2010, he received gram quantities of uncut heroin from

2

Vaughn.  According to Riley, he first purchased heroin directly from Vaughn.  In 2010, however, Vaughn began using Carlos Ford as a distributor.  From then on, Vaughn would deliver heroin to Riley through Ford.

Ford worked as a distributor for Vaughn from December 2009 through March 2010. Vaughn supplied Ford with heroin on a daily basis to sell in exchange for personal-use quantities or cash.  In the spring of 2010, Vaughn and Ford had a falling out due to customer complaints about the product's purity.  Later, Ford and Vaughn resumed their supplier/distributor relationship under a slightly different arrangement.  Rather than customers ordering directly from Ford, as they had in the past, the customers were required to contact Vaughn and then Vaughn would direct them on where and when to meet Ford.  Following a customer request, Vaughn would also contact Ford by cell phone, telling him when and where to meet the customer.

Ford testified that each morning during the summer of 2010, he picked up approximately fifty to seventy small bags containing pre-weighed heroin (also referred to as bindles or "dime bags") from Vaughn, along with a cell phone that enabled Vaughn to contact him and provide directions for prearranged purchases of heroin.  Each day after Ford's shift, Vaughn instructed Ford to drop off the money and any remaining heroin from that day to either Vaughn or Maurice C. Lockhart.

During that summer, Lockhart served in the same role as Ford and distributed heroin in front of his home in Beloit.  Generally, if customers wanted heroin during the day, Vaughn directed them to meet with Ford for the delivery; and if customers wanted heroin in the afternoon or evening, Vaughn directed them to meet with Lockhart.  Before

his dealings with Vaughn, Ford did not know Lockhart.  Further, while Ford obtained heroin from Vaughn and sold it as early as December 2009, Lockhart did not become involved with Vaughn until the spring of 2010, which was when Vaughn began exercising more control over the distribution of heroin.

After observing Ford driving erratically in Beloit on August 11, 2010, an officer conducted a traffic stop.  During that stop, officers searched Ford's person and located a key chain containing two bags of heroin.  After Ford was arrested, officers also observed him moving around in the back seat of the squad car as if he was attempting to conceal something behind him.  A strip search at the jail revealed seventy bindles containing a total of 11.621 grams of heroin between Ford's buttocks.  After weighing the contents of the bags, Detective Andre Sayles estimated that each bindle contained 0.13 gram of heroin.  Ford later testified that the seventy bags of heroin in his possession at the time of the arrest was his daily supply from Vaughn.

## II.    Indictment in Case No. 11-cr-90

On August 17, 2011, a grand jury in the Western District of Wisconsin returned a one-count indictment charging that in or about May 2010 and continuing until on or about August 2010, Maurice D. Vaughn and Maurice C. Lockhart knowingly and intentionally conspired and agreed with each other, with Carlos Ford, who was named as an uncharged co-conspirator, and with other persons known and unknown to the grand jury to distribute 100 grams or more of a mixture or substance containing heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846.  Before trial, Lockhart moved to dismiss the indictment as impermissibly vague

4

and requested a bill of particulars.   This court denied both motions and the case proceeded to trial.

### III.    Trial Testimony

During the trial, several witnesses testified about their interactions with Vaughn and Lockhart, which corroborated Ford's description of their heroin distribution arrangement.   The defendants' customers also testified to the amount of heroin they purchased from Lockhart and Ford.

In addition, Ford's girlfriend, Casie Kast, testified that during the summer of 2010, she would drive Ford to a house in Beloit, where Ford would pick up the day's supply of heroin from Vaughn.   Kast not only saw the daily supply of heroin, but used some of that heroin each day.   Kast also confirmed that Ford received cell phone calls from Vaughn, instructing Ford on when and where to meet customers for a prearranged purchase.   At the end of Ford's shift on approximately fifteen to twenty occasions, Kast explained that she drove Ford to Lockhart's house so that he could drop off the money from the heroin sales and pass the cell phone along to either Vaughn or Lockhart.

Witnesses Ashley Titus and Darrell Jackson also testified that they used heroin supplied by Ford and Lockhart in the summer of 2010.   Specifically, they described contacting an intermediary, Andre Simms, for the purchase of heroin.   In their presence, Simms would then make a phone call, and Titus and Jackson would then drive Simms to one of two typical locations as directed.   At the designated location, Titus and Jackson would watch as Simms met with one of two distributors, who both identified as Ford and Lockhart.

Simms further confirmed Titus's and Jackson's testimony about the heroin deals for which he acted as an intermediary, including his heroin purchases from Ford and Lockhart.  Simms similarly corroborated Ford's account of the manner in which heroin purchases from Ford changed during the summer of 2010, thereafter requiring Simms to call Vaughn to set up a purchase.  Finally, Simms testified that when he called Vaughn to purchase heroin, Vaughn would then instruct Simms to meet with either Ford or Lockhart at a specified location to complete the transaction.

Lawrence McShan testified that he also served as an intermediary for heroin users in order to support his own heroin habit.  In the summer of 2010, McShan would pick up heroin from Ford or Lockhart after calling a designated number to arrange a purchase. The person McShan called would direct him to meet with Ford during the morning hours and to meet with Lockhart during the evening hours.  On one occasion, when McShan met with Ford, McShan did not have enough money to cover his purchase.  McShan recalled that Ford told him, "You can't be short man. You gonna have to talk to Reese about this."  McShan testified that he knew "Reese" to be Maurice Vaughn.

Another witness, Crystal Freeman, used McShan as an intermediary for heroin deals, was also able to identify both Lockhart and Ford as heroin distributors.  Freeman testified that she watched McShan meet with Lockhart in front of his home on numerous occasions, and although she did not know his name, she recognized Lockhart from prior contact she had with him at her former place of employment in Beloit.   On other occasions, McShan would call someone on his cell phone before going to meet Ford. Freeman estimated that McShan met with Ford to purchase heroin for her approximately

thirty to forty times during the summer of 2010, and she observed McShan meet with Lockhart to get heroin "every day" that summer.   Finally, Freeman confirmed the different shifts during which Ford and Lockhart sold drugs:  Ford during the morning, and Lockhart sold in the afternoon and evening.

During trial, the government also showed each of the customers who testified the bags of heroin seized from Ford at the time of his arrest in August 2010.  Kast, Jackson, Simms, and Freeman all identified those bags as representative of the packaging they had seen used when purchasing heroin through either Ford or Lockhart.  Customers who bought multiple times in a single day (and who therefore ended up buying from both Ford and Lockhart) testified that the packaging in which they received the heroin was the same, whether purchased from Ford in the morning or Lockhart in the evening.

Customers also testified to the number of bags and the frequency with which they purchased heroin from Ford and Lockhart during the summer of 2010.  The government used the samples seized from Ford as a reference for the average weight of each bag. Detective Sayles, who had seized seventy bags of heroin from Ford after his arrest, testified to his estimate that each small package contained an average of 0.13 gram of heroin.

After the government rested its case at trial, both defendants moved to dismiss, alleging a failure to prove their involvement in the charged conspiracy beyond a reasonable doubt. This court denied the motions to dismiss.

### IV.    Jury Verdict and Sentencing

On January 25, 2012, a jury found both Vaughn and Lockhart guilty of conspiracy as charged in the one-count indictment, and they returned a special verdict that the conspiracy involved 100 grams or more of heroin. Neither defendant made a post-verdict motion for judgment of acquittal or a request for a new trial.

At this court's request, the probation office prepared a presentence report ("PSR") to assist in determining Vaughn's punishment. The PSR noted that the heroin actually seized from Ford actually weighed a total of 11.621 grams, resulting in an average weight per bag of 0.166 gram. Vaughn did not object to this calculation.

The PSR also outlined with relative specificity the frequency and bag number estimates attributed to each witness who admitted purchasing heroin from Ford and Lockhart. The probation officer multiplied the estimated number of bags obtained by each witness by the 0.13 weight estimate testified to by Detective Sayles at trial, unless a witness's description of the bag differed from what was typical. The Probation Office's calculation was then based on relevant conduct attributable to Vaughn, which resulted in a total drug weight of 1,568.65 grams of heroin. Based on that weight, the probation office determined that Vaughn's base offense level was 32. With a two-level increase for his role as an organizer, leader, manager or supervisor of the conspiracy, the probation office calculated his total offense level as 34. Vaughn had at least 10 criminal history points, placing him in Criminal History Category V. As a result, Vaughn faced a range of 235-293 months' imprisonment.

For reasons set forth in detail on the record during the sentencing hearing, as well as in the March 29, 2012, Judgment, the court ultimately sentenced Vaughn at the lower end of the advisory guideline range, to 240 months of imprisonment.  This period of incarceration is to be followed by an eight-year term of supervised release.

## V.    Post-Conviction Proceedings

On direct appeal, Vaughn argued that the evidence was insufficient to support the jury's verdict.  Vaughn also disputed the guideline calculation for sentencing, arguing that the court erred in calculating the relevant drug quantity, calculating his criminal history score, and applying a two-level enhancement for his role as a leader or organizer of the conspiracy.  Vaughn argued further that the sentence imposed was substantively unreasonable.  The Seventh Circuit rejected all of Vaughn's arguments and affirmed the conviction.  *See United States v. Vaughn*, 722 F.3d 918 (7th Cir. 2013).  Thereafter, the United States Supreme Court denied his petition for certiorari review.  *Vaughn v. United States*, 134 S. Ct. 541 (Nov. 4, 2013).

Vaughn now seeks relief from his conviction under 28 U.S.C. § 2255, arguing that he was denied effective assistance of counsel at his trial and sentencing proceedings.  The government argues that Vaughn's claims are without merit.[2]

---

[2] The government also argues that Vaughn's ineffective-assistance claims are barred by the doctrine of procedural default, because they could have been raised on direct appeal.  The court does not address this argument because it appears contrary to precedent.  *See Massaro v. United States*, 538 U.S. 500, 509 (2003) (holding that failure to raise an ineffective-assistance-of-counsel claim on direct appeal does not bar the claim from being brought in a later, appropriate proceeding under 28 U.S.C. § 2255).

OPINION

A motion for relief under 28 U.S.C. § 2255 invokes "an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 520 (7th Cir. 2007) (citing *Kafo v. United States*, 467 F.3d 1063, 1068 (7th Cir. 2006)). Accordingly, relief under § 2255 is generally appropriate for "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004) (quoting *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1991)).[3]

In this case, Vaughn contends that he is entitled to relief under § 2255 because he was denied his Sixth Amendment right to receive effective assistance of counsel in connection with his trial and sentencing. The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to have the assistance of counsel at trial. *See* U.S. Const. amend. VI; *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). The right to counsel guaranteed by the Sixth Amendment includes "the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970) (emphasis added). Claims for ineffective assistance of counsel are analyzed under a standard first articulated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 688 (1984). To prevail under this standard, a defendant must demonstrate (1) a constitutionally deficient performance

---

[3] A motion under § 2255 cannot be used to relitigate matters that were raised on direct appeal. *Varela v. United States*, 481 F.3d 932, 935 (7th Cir. 2007). Even claims omitted on direct appeal may only be considered on collateral review if the petitioner can show good cause for failing to raise the issue previously and actual prejudice based on the alleged error. *See, e.g., Fuller v. United States*, 398 F.3d 644, 648 (7th Cir. 2005).

by counsel *and* (2) actual prejudice as a result of that deficiency. *See Williams v. Taylor*, 529 U.S. 390, 390-91 (2000). "Unless a defendant makes both showings, it cannot be said that the conviction…resulted from a breakdown in the adversary process that renders that result unreliable." *Strickland*, 466 U.S. at 687.

To demonstrate deficient performance, the petitioner must show "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. "This means identifying acts or omissions of counsel that could not be the result of professional judgment. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011) (internal quotation marks and citations omitted). "Our review of the attorney's performance is 'highly deferential' and reflects 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Davis v. Lambert*, 388 F.3d 1052, 1059 (7th Cir. 2004) (quoting *Strickland*, 466 U.S. at 689); *see also Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 787 (2011) ("A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." (internal quotation marks and citation omitted)).

Here, Vaughn contends that his trial counsel, Amber Lucsey, was deficient in failing to:  (1) oppose the admission of hearsay statements by Carlos Ford; (2) object to photographic evidence; (3) file an adequate memorandum of law to oppose the admissibility of "other bad acts" evidence under Fed. R. Evid. 404(b); (4) file a post-verdict motion for judgment of acquittal; (5) file a motion for a mistrial; (6) move to dismiss the indictment on the grounds of vindictive prosecution; and (7) object to the drug calculation in the PSR.  These claims are addressed separately below.

## I.     Failure to Oppose Co-Conspirator Hearsay

Vaughn first contends that his attorney was deficient for failing to oppose the admissibility of hearsay statements by Carlos Ford.  Vaughn appears to take issue with testimony by an investigator (Investigator McMahon) regarding Carlos Ford's post-arrest statements, which were offered before the grand jury.  As the government correctly notes, the rules of evidence (other than those regarding privilege) do not apply during grand jury proceedings. *See* Fed. R. Evid. 1101(d)(2); *United States v. Calandra*, 414 U.S. 339, 343 (1974) (technical procedural and evidentiary rules governing criminal trials generally do not restrain grand jury proceedings); *Costello v. United States*, 350 U.S. 359 (1956) (a conviction can be sustained even if indictment is based exclusively on hearsay). Therefore, Vaughn cannot show that his defense attorney was deficient for failing to challenge hearsay evidence presented to the grand jury.

The government notes further that Carlos Ford's post-arrest statements were *not* offered at trial as co-conspirator hearsay.  At trial, any evidence of Carlos Ford's post-

arrest statements or interviews was admitted when Ford took the stand, both to corroborate *and* impeach. (*Trial Trans.*, dkt. # 140 [11-cr-90] at 29-80.)

Finally, the evidence that Vaughn was engaged in a larger, ongoing conspiracy to distribute heroin in which he orchestrated Ford's morning sales and Lockhart's afternoon sales was overwhelming. As a result, any objection to Ford's statements made during the course and in furtherance of their joint conspiracy was admissible under Fed. R. Evid. 801(d) in any event. Under these circumstances, Vaughn fails to show that co-conspirator hearsay evidence was improperly admitted or that his attorney was deficient for failing to subject Ford's testimony to additional adversarial testing.[4] Accordingly, Vaughn fails to establish an ineffective-assistance claim with respect to Ford's statements.

## II.  Failure to Object to Photographic Evidence

Vaughn also contends that his attorney was deficient for failing to object to the admission of three photographs depicting the bindles of heroin seized from Ford after his arrest. Neither defense counsel for Vaughn or Lockhart objected to the photographs, which were admitted during Carlos Ford's testimony. (*Trial Trans.*, dkt. # 140 [11-cr-90] at 34.) However, Vaughn does not articulate, nor is this court able to discern, a valid objection that Vaughn's counsel might have made to this evidence. "[O]bviously, an attorney is not constitutionally deficient for failing to lodge a meritless objection."

---

[4] As part of his argument regarding Ford's statements, Vaughn also attempts to attack the credibility of other witnesses, arguing that there was insufficient evidence of a conspiracy. However, Vaughn challenged the credibility of witnesses and the sufficiency of the evidence on direct appeal to the Seventh Circuit, which rejected Vaughn's arguments. Because Vaughn's argument regarding the sufficiency of the evidence was resolved against him on direct appeal, he may not relitigate that issue on collateral review. *Varela*, 481 F.3d at 935. Therefore, the court does not address this argument further.

*Northern v. Boatwright*, 594 F.3d 555, 561 (7th Cir. 2010).  Since any objection would have been overruled as meritless, Vaughn's attorney was not constitutionally deficient for failing to object to the admission of these photographs.  *See Lambert v. McBride*, 365 F.3d 557, 564 (7th Cir. 2004) (finding no deficient performance where the proposed objection would have been overruled if made).

### III.    Failure to Keep Out Other Acts Evidence

Vaughn next argues that his attorney was deficient for failing to keep out evidence of his prior heroin transactions with Ford between 2009 and 2010.  Vaughn argues that because these prior transactions were evidence of a separate conspiracy, the evidence should have been excluded at trial under Fed. R. Evid. 404(b) as evidence of other bad acts.

As Vaughn concedes, his attorney *did* challenge the admissibility of the transactions involving Ford.  (*Def.'s Mem. in Opposition to Admissibility of Rule 404(b) Evidence*, dkt. # 69 [11-cr-90], at pp. 1-5.)  In particular, Vaughn's attorney argued that: (1) introducing evidence of these prior drug transactions "would unduly prejudice the jury against Vaughn"; and (2) this evidence "is precisely the definition of 'propensity' evidence that 404(b) is drafted to exclude."  (*Id*.)  Based on existing case law, however, the court ultimately allowed the evidence to be admitted as proof of the formation of the conspiracy, and not as proof of Vaughn's propensity to commit drug crimes.  (*Order*, dkt. #152 [11-cr-90], at 17-20.)

Having made the very objection that he would now fault counsel for not making, Vaughn obviously demonstrates neither deficient performance nor actual prejudice.  Nor

14

does Vaughn show that the evidence was improperly admitted.  Regardless, any attack on the court's ruling itself was lost on Vaughn's direct appeal.  *See* discussion, *supra*, fn. 3. Accordingly, his allegations are insufficient to establish ineffective assistance of counsel.

## IV.    Failure to Move for Acquittal

Vaughn also faults his trial counsel for failing to renew his motion for acquittal at the close of trial.  Notably, both defendants moved for a directed verdict at the close of the government's case, but neither renewed their motions nor made a motion for judgment of acquittal after the jury returned a guilty verdict.  Vaughn contends that he was prejudiced as a result of his attorney's failure to seek a judgment of acquittal because it caused the court of appeals to apply a more stringent standard of review during his direct appeal.

First, Vaughn does not demonstrate that his attorney was deficient for failing to file a post-verdict motion for judgment of acquittal.  According to Vaughn's attorney, she did not move for acquittal for two reasons: (1) the strength and volume of the government's evidence made such a motion meritless; and (2) she wanted to preserve Vaughn's opportunity to accept responsibility for his convictions during the sentencing phase of trial.  (Dkt. #1, Exh. 5 [14-cv-317], at 1.)  To the extent that Vaughn argues that his attorney should nevertheless have filed a motion for judgment of acquittal, the court cannot find based on the overwhelming evidence against him, that his trial attorney's strategy was unreasonable or deficient under these circumstances.  *Cf. Galowski v. Murphy*, 891 F.2d 629, 639 (7th Cir. 1989) (decision whether to move for a

mistrial or instead to proceed to verdict with the expectation that the client will be acquitted is one of trial strategy).

Second, Vaughn fails to show that he was prejudiced as a result of his counsel's failure to move for a judgment of acquittal. Even though the Seventh Circuit noted on direct appeal that the defendants did not renew their motions for acquittal following the jury's guilty verdict, *see Vaughn*, 722 F.3d at 928, the appellate court went on to apply a lesser standard of review reserved for cases in which such motions had been renewed, and the court *still* found that there was sufficient evidence to support the conviction on the conspiracy charge. *Vaughn*, 722 F.3d at 928-29. Accordingly, Vaughn fails to show that he was prejudiced as the result of his attorney's decision not to move for a judgment of acquittal following the jury's verdict. Absent a showing of deficient performance and actual prejudice, Vaughn again fails to establish a valid ineffective-assistance claim.

## V.    Failure to Move for Mistrial

During a pre-trial hearing, the court excluded evidence of or reference to: (1) heroin transactions that Vaughn had with Jesse Green; and (2) the attempt by a confidential informant to purchase heroin from Vaughn in 2007. (Dkt. #79 [11-cr-90], at 1-2.) The government followed this directive during trial. During cross examination of Investigator McMahon, however, counsel for Vaughn's co-defendant asked the investigator if he had been "familiar with a man named Maurice Vaughn" before the 2009 investigation that resulted in the criminal charge that was the subject of the trial. (*Trial Trans.*, dkt. # 140 [11-cr-90] at 58.) In response, Investigator McMahon indicated that he was familiar with Vaughn, "Probably farther back than that." (*Id*.) Although no

16

specific information was solicited or provided by Investigator McMahon, Vaughn argues that his attorney was deficient for failing to move for a mistrial.

The record does not disclose a basis for a mistrial or any deficiency on defense counsel's part.   Vaughn's attorney addressed the potentially prejudicial nature of Investigator McMahon's remark and ultimately decided not to request a curative instruction to the jury.   (*Trial Trans.*, dkt. # 140 [11-cr-90] at 80-81.)   As this court noted, a curative instruction based on a passing reference to a possibly prejudicial issue could draw unwanted attention by the jury.   (*Id.* at 81.)   The Seventh Circuit has also recognized that "competent trial strategy frequently is to mitigate damaging evidence by allowing it to come in without drawing attention to it." *Hardamon v. United States*, 319 F.3d 943, 949 (7th Cir. 2003).   Counsel's strategy at the time of the investigator's stray comment was sound, and any subsequent motion for mistrial would have been denied if made.   It follows that Vaughn does not establish a valid ineffective-assistance claim in this context.

## VI.    Failure to Challenge Indictment for "Vindictive Prosecution"

Noting that Beloit police had been attempting to charge him with drug trafficking offenses since 2007, Vaughn contends that his attorney was deficient in failing to challenge his 2011 indictment on the grounds of "vindictive prosecution."   This claim is essentially frivolous.

A claim of selective or vindictive prosecution "asks a court to exercise judicial power over a 'special province' of the Executive," which is particularly ill-suited to judicial review.   *United States v. Armstrong*, 517 U.S. 456, 464 (1996).   In that respect, the

Attorney General and United States Attorneys retain "broad discretion" as to whom they prosecute. *Wayte v. United States*, 470 U.S. 598, 607 (1985) (internal quotation and citation omitted). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). As a result, prosecutorial decision making is entitled to "[t]he presumption of regularity," meaning that "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Armstrong*, 517 U.S. at 464 (quoting *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14-15 (1926)). Under this "rigorous standard," *Armstrong*, 517 U.S. at 468, a claim of vindictive prosecution is "extremely difficult to prove." *United States v. Jarrett*, 447 F.3d 520, 526 (7th Cir. 2006).

A prosecution *may* be considered vindictive where it "was pursued in retaliation for the exercise of a protected statutory or constitutional right." *United States v. Cooper*, 461 F.3d 850, 856 (7th Cir. 2006) (citing *United States v. Monsoor*, 77 F.3d 1031, 1034 (7th Cir. 1996)); *see also United States v. Pittman*, 642 F.3d 583, 586 (7th Cir. 2011). For example, where a defendant succeeds in obtaining a reversal on appeal and the government brings more serious charges, there is a presumption of vindictiveness that the government must rebut. *See id.* (citing *United States v. Goodwin*, 457 U.S. 368, 376 (1982)). Otherwise, to succeed on a claim of prosecutorial vindictiveness, a defendant "must affirmatively show through objective evidence that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in

the outcome of the case or an attempt to seek self-vindication." *Jarrett*, 447 F.3d 520, 525 (quoting *United States v. Falcon*, 347 F.3d 1000, 1004 (7th Cir. 2003) (citations omitted)).  A defendant may do this by showing the decision to pursue an indictment was not based on the "usual determinative factors" that a responsible prosecutor would consider before bringing charges.  *Id*.  To make this showing, a court must be persuaded that the defendant would not have been prosecuted but for the government's animus or desire to penalize him.  *Id*.

According to Vaughn, the prosecution in this case was motivated by the failed controlled buy that occurred in June 2007.  After this incident, Vaughn was arrested and charged by the State of Wisconsin with robbery and criminal damage to property for destroying a wire listening device.  Those charges were eventually dismissed.  According to Vaughn, "this is what infuriated [Investigator] McMahon and motivated him to team up with A.U.S.A. Robert A. Anderson to induce witnesses to fabricate a conspiracy that the petitioner was not part of, and never existed."  (Dkt. #1 [14-cv-317] at 21.)

In this instance, Vaughn was not prosecuted for any of the events, facts or conduct that gave rise to his state court prosecution in 2007.  Likewise, the federal government had no involvement in the state prosecution that stemmed from Vaughn's attempted delivery of heroin to a confidential informant in 2007.  Moreover, Vaughn presents no objective, much less credible, evidence that the dismissed charges stemming from the unsuccessful controlled buy in 2007 was a determining factor in the federal government bringing the charges outlined in the 2011 indictment here.

19

In view of the substantial nature of the independent evidence against him in this case, the court is also unpersuaded that Vaughn would not have been prosecuted but for any improper prosecutorial animus.  Regardless, having fallen far short of the showing necessary to demonstrate vindictive prosecution, Vaughn has no basis to assert that his attorney was deficient for failing to file a motion challenging the indictment on these grounds.

## VII.   Failure to Object at Sentencing

Finally, Vaughn contends that his trial attorney was deficient for failing to object to the guideline calculations in the PSR for purposes of sentencing.  Vaughn's argument focuses on the drug quantity that was used to determine his base offense level.  According to Vaughn, that calculation was based on insufficient and unreliable evidence of a conspiracy.  Therefore, according to Vaughn, his attorney should have objected to the guideline determination in the PSR based on insufficiency of the evidence.

Again, however, Vaughn does not demonstrate that his attorney had, but failed to make, a valid objection to the PSR.  In fact, the government presented fairly compelling evidence of defendant's leadership in a conspiracy to distribute heroin in the Beloit area during the summer of 2010.

Likewise, for reasons outlined by the Seventh Circuit, Vaughn cannot demonstrate that he was prejudiced as the result of his attorney's performance.  Importantly, the Seventh Circuit ruled on direct appeal that there was ample evidence to support Vaughn's conviction for conspiracy.  The Seventh Circuit concluded further that Vaughn's sentence was properly calculated under the advisory guidelines.  *See Vaughn*,

20

722 F.3d at 930-36.  In doing so, the Seventh Circuit specifically took into account the amount of drugs attributable to Vaughn based on relevant conduct.  *Id*. at 930-31. Vaughn does not show that this relevant conduct was improperly considered in calculating his sentence, nor that his attorney was deficient for failing to object to its consideration.

## VIII.  Certificate of Appealability

Vaughn has neither shown that he was denied effective assistance of counsel, nor that he is otherwise entitled to relief from his conviction and sentence under 28 U.S.C. § 2255.  Absent any valid claim for relief, his § 2255 motion must be denied.  Under Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts, the court must nevertheless issue or deny a certificate of appealability when entering a final order adverse to the applicant.  A certificate of appealability will not issue unless the applicant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  This requires an applicant to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).[5]

---

[5] Under this controlling standard, an applicant must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  Where denial of relief is based on procedural grounds, the applicant must show not only that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right," but also that they "would find it debatable whether the district court was correct in its procedural ruling." *Slack,* 529 U.S. at 484.

Although Rule 11 allows the court to direct the parties to submit arguments on the possible issuance of a certificate of appealability, it is unnecessary to do so in this instance.  For the reasons stated above, the court concludes that no reasonable jurist would debate whether a different result was required.  For this reason, no certificate of appealability will issue.

ORDER

IT IS ORDERED:

(1) Maurice D. Vaughn's motion for relief from his conviction and sentence under 28 U.S.C. § 2255 is DENIED.

(2) A certificate of appealability is DENIED.  If Vaughn wishes he may seek a certificate from the court of appeals under Fed. R. App. 22.

Entered this 6th day of January, 2017.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge